**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WANDA L. BATES,** | : | **No. 3:05cv2285** |
| **Plaintiff** | : | |
| **v.** | : | **(Judge Munley)** |
| | : | |
| **MHM CORRECTIONAL SERVICES;** | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **CORRECTIONS SCI-FRACKVILLE;** | : | |
| **DAVID MONT; ROBERT D.** | : | |
| **SHANNON and JOHN** | : | |
| **W. KERESTES,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

_____Before the court for disposition are the defendants' motions for summary judgment in this employment discrimination case.  The motions have been fully briefed and are ripe for disposition.

**Background**

Defendant MHM Correctional Services is in the business of providing onsite mental health services to inmates at correctional systems such as state and local prisons and juvenile detention centers.  MHM subcontracted with Defendant Pennsylvania Department of Corrections (hereinafter "DOC")  to provide such services at the State Correctional Institution at Frackville ("SCI-Frackville") as of August 31, 2003.  Prior to January 1, 2003, Sadar Psychological Services had the contract to provide mental health services to SCI-Frackville.  From January 1, 2003 through August 31, 2003, the contract was held by Wexford Health Sources, Inc., and then MHM took over.

Plaintiff Wanda L. Bates  began working for Sadar as a "program specialist" in the Mental Health Unit of SCI-Frackville in November 2002.  When Wexford took over the contract, in January 2003, plaintiff stayed on

as a Program Specialist.   Defendant MHM began providing mental health services to SCI-Frackville on September 1, 2003.  They retained plaintiff as an employee and changed her title to Activities Specialist.

On July 31, 2004, plaintiff was *en route* to a class she was directing in the prison when she came upon a locked door.  She knocked on the door and indicated to the officer on post in the area that she wanted him to unlock the door for her.  A window in the door allowed the officer to see the top portion of plaintiff, including her face. Evidently, there was some delay in the officer unlocking the door.  Plaintiff accused the officer of making her wait due to her race, African-American.

 Bates then went to the class she was holding, which consisted of between ten to thirteen inmates of different races.  She reported to her class what had happened and indicated that the officer was "ignorant." These incidents started a series of events which eventually led to plaintiff being banned from the prison as a security risk and the termination of her employment with MHM.[1]

During the relevant time period, Defendant Robert Shannon was the Superintendent at SCI-Frackville and was responsible for the overall management of the facility.  Defendant John W. Kerestes was Deputy Superintendent for Centralized Services at SCI-Frackville.  His responsibilities included overseeing all treatment programs including the Mental Health Programs, activities programs, education programs, food service, laundry and other programs.   Defendant David Mont, an employee of MHM, was the Program Director of the SCI-Frackville Mental

---

[1]The facts are addressed with more particularity and citations to the record below where appropriate.

2

Health Unit and plaintiff's direct supervisor.

Subsequent to her termination, plaintiff instituted the instant nine-count complaint that raises the following causes of action: 1) violation of 42 U.S.C. § 1981 and § 1983; 2) violation of 42 U.S.C. § 1985; 3) discrimination because of race under Title VII of the Civil Rights Act, as amended; 4) hostile work environment violation of Title VII of the Civil Rights Act of 1964, as amended; 5) retaliation; 6) age discrimination in employment; 7) conspiracy; 8) wrongful discharge; and 9) violation of the Pennsylvania Human Relations Act.   At the close of discovery two groups of defendants filed motions for summary judgment.  The defendants also filed motions to strike some of the plaintiff's exhibits that she filed in support of her motion, bringing the case to its present posture.

**Jurisdiction**

Because this case is filed, in part, for unlawful employment discrimination pursuant to federal law, we  have jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  We  have supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**Standard of review**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged

3

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. <u>International Raw Materials, Ltd. v. Stauffer Chemical Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. <u>Id.</u> Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. <u>Id.</u> at 324.

**Discussion**

The defendants in this case can be broken into two groups, those who actually employed the plaintiff, that is MHM Correctional Services and David Mont (hereinafter collectively "MHM Defendants") and the Pennsylvania Department of Corrections, SCI-Frackville, Robert D. Shannon and John W. Kerestes (hereinafter collectively the "Corrections

4

Defendants"). Both sets of defendants filed motions for summary judgment on all of the plaintiff's claims. We will address each count of plaintiff's complaint separately.

## I. Violation of 42 U.S.C. § 1981 and § 1983, First, Fourth, Sixth and Fourteenth Amendments

The first count of the plaintiff's complaint alleges that all the defendants violated her rights under the First, Fourth, Sixth and Fourteenth Amendments to the United States Constitution. The cause of action is brought pursuant to 42 U.S.C. § 1981 (hereinafter "section 1981") and 42 U.S.C. § 1983 (hereinafter "section 1983"). (Doc. 1, Compl. ¶ 82).

Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Thus, to establish a claim under section 1983, two criteria must be met. First, the conduct complained of must have been committed by a person acting under color of state law. Second, the conduct must deprive the complainant of rights secured under the Constitution or federal law. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998).[2] Both sets of defendants move for judgment on the section

---

[2]Section 1981 provides that all persons shall, *inter alia*, have the same right to make and enforce contracts and have the full and equal benefit of all laws to the same extent enjoyed by white citizens. Plaintiff does not explain how she deems the defendants violated this section. As

1983 claim.  We will address them separately.

### A. MHM Defendants

The MHM Defendants are not part of the government.  Thus, they assert that they did not act under the color of state law and that they cannot be held liable under section 1983.  After a careful review, we agree.

MHM is a private company, although it does contract with the DOC to provide services at state prisons.  The mere fact that a private party has a contract with the state does not render a private company a state actor. Black v. Indiana School Dist., 985 F.2d 707, 710 (3d Cir. 1993).

Rather, in Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982), the United States Supreme Court set forth four tests that are used to determine if a private entity has become a state actor for section 1983 purposes. These tests are: 1) the public function test, 2) the state compulsion test, 3) the nexus test and 4) the joint action test.  Id. at 939. In the instant case, we will address only the fourth test, "the joint action test" as plaintiff asserts that MHM Defendants acted jointly with the state. In order for this test to be satisfied, a private actor must at least be "a willful participant in joint activity with the State or its agents."  Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 195 (3d Cir. 2005) (quoting United States v. Price, 383 U.S. 787, 794 (1966)).

> "Joint action" has been explained as follows:
> [t]he requirement of action under color of law is
> satisfied ... when a private person willfully

---

it is grouped with her section 1983 cause of action, we assume that her position is that her right to contract was violated due to the improper violation of her constitutional rights.  As we find no violation of her constitutional rights, judgment will be granted to the defendants on the section 1981 claim.

> participates in joint action with a state official ....
> Thus, [to survive the defendant's motion for
> summary judgment,] plaintiff must demonstrate a
> genuine issue of material fact that there existed
> between the private defendant and the state official
> an understanding, agreement, or conspiracy to
> deprive the plaintiff of a federal right. He must show
> a genuine factual issue of a combination,
> agreement, or understanding among the
> defendants.... These [sic] must also be a genuine
> factual issue that the defendants plotted, planned,
> or conspired together to carry out the chain of
> events.

Drum v. Nasuti, 648 F.Supp. 888, 897 (E.D.Pa.1986), aff'd mem., 831 F.2d

286 (3d Cir.1987) see also Smith v. Wambaugh, 29 F. Supp. 2d 222, 228

(E.D. Pa. 1998).

The United States Supreme Court has indicated that the necessary

close nexus between the State and the challenged action must be such

that seemingly private behavior may "fairly be treated as that of the state

itself."  Brentwood Academy v. Tennessee Secondary School Athletic

Ass'n, 531 U.S. 288, 295 (2001).[3]

---

[3]As indicated by Brentwood, the Supreme Court has found state
action in various situations.

> Our cases have identified a host of facts that can
> bear on the fairness of such an attribution. We
> have, for example, held that a challenged activity
> may be state action when it results from the State's
> exercise of coercive power, when the State
> provides significant encouragement, either overt or
> covert, or when a private actor operates as a willful
> participant in joint activity with the State or its
> agents. We have treated a nominally private entity
> as a state actor when it is controlled by an agency
> of the State, when it has been delegated a public
> function by the State, cf., e.g., when it is entwined
> with governmental policies," or when government is
> entwined in [its] management or control.

7

In the instant case, the corrections defendants are alleged to have improperly barred the plaintiff from the prison.  Subsequently, the MHM defendants terminated her employment.  Joint action would have to be in established by demonstrating that the MHM defendants worked together with the corrections defendants (state actors)  to ensure that she become barred from the prison.  Plaintiff has provided no such evidence.  Rather, the defendants have presented evidence that the DOC can bar MHM employees from the prison without any knowledge, input or approval from MHM.  (Doc. 35-3, Welch Aff. at ¶ 10).  Additionally, MHM made all the decision with respect to plaintiff's discipline throughout her employment and ultimate termination without any direction or consultation with the DOC.  (Doc. 35-3, Welch, ¶ 16; Doc. 35-39, Mont Aff. ¶ 37).  Plaintiff has presented no evidence of joint activity between the state actors and the non-state actors to bar the plaintiff from the prison or to terminate her employment.  In fact, as set forth above,  the uncontested evidence establishes that no one from MHM was involved in DOC's investigation that led to her dismissal, and no DOC officials were involved in MHM's decision to terminate plaintiff's employment.  (Doc. 35-3, Welch Aff. at ¶ 16; Doc. 48-2, Mont Aff. at ¶ 37).   Accordingly, summary judgment is appropriate to the MHM defendants on all of the plaintiff's civil rights claims.

We will therefore grant judgment to the MHM Defendants on

---

Brentwood., 531 U.S. at 930 (internal citations and quotation marks omitted). The plaintiff only briefed the "joint activity" theory, however, and that is the sole issue we will address.

plaintiff's section 1983 claim.[4]

### B. The Corrections Defendants

The Corrections Defendants address each of the plaintiff's alleged constitutional violations beginning with the claim that she was banned from the prison in retaliation for exercising her First Amendment freedom of speech in speaking to her class of inmates.

The law provides that:  "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410; 126 S.Ct. 1951, 1957 (2006) (citations omitted). Courts employ a three step analysis to determine whether a public-employee plaintiff has established a First Amendment retaliation claim.

First, the plaintiff must demonstrate that she "spoke as a citizen on a matter of public concern." Id. at 1958 (citations omitted).  Second, the plaintiff must establish "the protected activity was a substantial or motivating factor in the alleged discriminatory action." Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir.2001).  Third, the government can rebut the claim by demonstrating it would have reached the same decision even in the absence of the protected conduct. Id.. The second and third stages present questions of fact for the jury. Id.

In the instant case, we need not proceed past the first step of the analysis.  That is, was the plaintiff speaking as a citizen addressing matters of public concern?  We conclude that she was not.   The plaintiff when

---

[4]Even if we had found joint action, however, summary judgment would nonetheless be appropriate.  As set forth in the next section, plaintiff cannot establish a violation of any of her constitutional rights.

speaking to the inmates did so *not as a private citizen* but as a part of her employment.    Plaintiff herself admits that the statements were made pursuant to her duties to hold her classes with the inmates.  Accordingly, they are not protected by the First Amendment.  See Garcetti, 126 S.Ct. at 1960 (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline").   Plaintiff's First Amendment claim is thus completely without merit and summary judgment will be granted to the defendants on that claim.

       Plaintiff also alleges that her First Amendment rights and Fourth Amendment rights were violated because her mail was intercepted and her telephone calls were monitored.  Although the plaintiff's complaint and brief are not a model of clarity, it appears that these correspondences and telephone calls were received in the course of her employment or at least at the place of her employment.  First, we note that the matters of which plaintiff complains apparently are matters that were done to her by Mont, not the DOC.  As set forth above, Mont is not a state actor and not liable to the plaintiff for constitutional claims.

       Regardless, plaintiff has not cited any authority to establish that she possessed a privacy interest in the mail.  The Corrections Defendants have presented evidence with regard to their policy toward inmate mail to staff. All mail that is sent internally at the prison is subject to review by security. (Doc. 47-3, Corrections Def. Ex. B, Aff. of John W. Kerestes at ¶ 8). Moreover, when an inmate writes to a staff member, it is a routine matter that is not sent in a sealed envelope, but rather on a request slip which is

10

read by the staff to determine where it should be sent.  (<u>Id.</u>).  If a letter is sent in a sealed envelope, it is normal for security to open it.  (<u>Id.</u>).

The Honorable Terrence F. McVerry of the United States District Court for the Western District of Pennsylvania in a well-reasoned opinion explained the privacy interest in inmate correspondence as follows:

> In <u>Stroud v. United States</u>, 251 U.S. 15, 21-22 (1919), the United States Supreme Court held that there was no violation of the Fourth Amendment when letters containing incriminating material written by a prisoner were intercepted by prison personnel and later introduced against him at trial. The Supreme Court noted that the letters came into the possession of prison officials under established practice, reasonably designed to promote institutional discipline. Id. at 21. Several circuit courts subsequent to <u>Stroud</u> have held that jail officials do not violate an inmate's Fourth Amendment rights by inspecting the inmate's mail. <u>See, e.g.</u>, <u>Stow v. Grimaldi</u>, 993 F.2d 1002, 1004-05 (1st Cir.1993) (holding that a New Hampshire State Prison practice of requiring nonprivileged outgoing mail to be submitted for inspection in unsealed envelopes does not violate prisoners' constitutional rights); <u>Smith v. Delo</u>, 995 F.2d 827, 830 (8th Cir.1993) (prison officials are justified in screening outgoing nonlegal mail for escape plans, contraband, threats, or evidence of illegal activity); <u>United States v. Whalen</u>, 940 F.2d 1027, 1034-35 (7th Cir.), cert. denied, 502 U.S. 951 (1991) (holding that because prison officials are permitted to examine inmate mail to ensure that the mail does not interfere with the orderly running of the prison, contain threats, or facilitate criminal activity, there is no expectation of privacy in mail that inmates are required to leave unsealed); <u>United States v. Kelton</u>, 791 F.2d 101, 103 (8th Cir.1986) (prisoner's Fourth Amendment rights were not violated when prison official inspected and copied prisoner's outgoing mail); <u>Smith v. Shimp</u>, 562 F.2d 423, 426-27 (7th Cir.1977) (reasoning that when a pretrial detainee sends non-privileged mail, he knowingly exposes same to possible inspection by jail officials and consequently yields to reasonable search and seizure); <u>United States v. Baumgarten</u>, 517 F.2d 1020, 1028 (8th Cir.), cert. denied, 423 U.S. 878 (1975) (holding that, under circumstances where prisoner knew of official policy of reading

11

prisoners' outgoing and unsealed mail, prisoner cannot say the state gained access to contents of a letter by unlawful search and seizure). United States v. Solomon, No. 02:05cr0385-01, 2007 WL 1099097 at *3 (W.D. Pa. April 11, 2007).

Plaintiff has provided no reasoned explanation as to why she believes she possessed a privacy interest in the correspondence and phone calls at issue.[5]  In light of the prison setting, and in light of plaintiff's failure to provide a basis for her claim to privacy, we reject her First Amendment/Fourth Amendment claim.  Summary judgment will therefore be granted for the defendants on these claims.

The plaintiff next asserts that her Fourteenth Amendment Due Process rights were violated because as an employee of the DOC, she had a right to notice of any alleged violations, pre-disciplinary hearing and a post-disciplinary hearing.  We disagree.

Plaintiff's position lacks merit because she was *not* an employee of the DOC.  MHM, a subcontractor of the DOC, employed plaintiff.   Plaintiff argues that the fact that she received a handbook outlining a code of ethics from the Department of Corrections means that she was in fact its employee.  Plaintiff provides no support for this proposition.  As the DOC points out, to rule that receipt of a handbook renders one an employee would lead to the ludicrous result of all prisoners being deemed employees of the DOC as they too receive the handbooks.

Accordingly, we find no merit to plaintiff's Fourteenth Amendment

---

[5]Instead, plaintiff's affidavit and brief contain self-serving conclusory statements such as: "I was given these two letters before they ever got to my mail so this was strictly based upon discrimination and harassment." (Doc. 59-6, Pl. Aff. ¶ 22*ll*(iii)).

claim and judgment will be granted to the defendants.

Plaintiff's complaint also asserts a violation of the Sixth Amendment to the United States Constitution.  The Sixth Amendment provides rights to criminal defendants including a speedy trial, the right to confront witnesses against them and the right to counsel.  See U.S. CONST. amend. VI. Neither plaintiff's complaint nor her brief explains how the Sixth Amendment is applicable in the instant case.  Thus, judgment will be granted to the defendants on plaintiff's Sixth Amendment claim.

For all the above reason, judgment will be granted to the defendants on plaintiff's section 1981 and section 1983 claims.

## II.  Violation of 42 U.S.C. § 1985

Plaintiff asserts that Defendant David Mont, Robert D. Shannon, and John W. Kerestes conspired to discriminate against her, harass her and to dismiss her because of her gender, race and age and in retaliation for having engaged in a protected activity by reporting unlawful activities within the prison system in violation of 42 U.S.C. § 1985.  (Doc. 1, Complaint ¶¶ 83-89).[6]  Plaintiff avers that in furtherance of this conspiracy defendants met and communicated at several diverse times and at places "to be revealed through the course of discovery."  (Id. at 86).

Under 42 U.S.C. § 1985(3) conspiracies to violate an individual's civil rights are actionable. The United States Supreme Court has set forth the elements of a § 1985 action as follows:

---

[6]Section 1985 contains three subsections.  Plaintiff fails to specify which subsection she is suing under, but it appears that section 1985(3) is the only section that may be applicable.  Therefore, we shall assume that she is proceeding under section 1985(3).

13

> [T]he plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

United Bhd. of Carpenters and Joiners of America, Local 610 v. Scott, 463 U.S. 825, 828-29 (1983).

Plaintiff has insufficient evidence to support her conspiracy claims. In order to support her claim, the evidence would have to be sufficient to permit a jury to conclude that the MHM Defendants and the Corrections Defendants decided to implement a scheme whereby the Corrections Defendants would concoct a way to ensure that the plaintiff was banned from the prison so that the MHM Defendants could justify terminating her employment. Additionally, the termination would have to be based upon plaintiff's race, gender or in retaliation for some protected action taken by the plaintiff. The plaintiff has produced no such evidence. While she has evidence that the various individuals met, there is no evidence that they worked together to ensure that the plaintiff was banned from the prison for some invidious reason.

The first evidence of a Corrections Defendant speaking with an MHM Defendant is a note made my Defendant Mont. The hand-written note states: "6-24-03  Deputy Kerestes asked me if [I am] having problems with Wanda. I told him there were a number of issues in [the] last few months that there were two outbursts [and] I have been trying to make corrective actions within the Wexford chain of command. I showed him Wanda's response about Mr. Shipley. He said he heard that we don't speak to each [other]. I told him I speak with her daily. He asked to be kept informed."

14

(Doc. 58-4, Pl. Ex. DD).   Thus, this note provides no evidence that Mont and Kerestes were conspiring against the plaintiff for some discriminatory end.

The second note, also written by Mont, states as follows: "Reviewed correspondence [to plaintiff] from another inmate who had been a patient. I [recommended] not corresponding. [Plaintiff] took exception [and] wants to discuss this with the Deputy.  Later discussed issue with Deputy.  He also [recommended] not corresponding.  Deputy asked for a memo on the morning, wants me to follow up."  (Doc. 58-4, Pl. Ex. DD, at 2).  The uncontested evidence indicates that it was the plaintiff herself who requested that Kerstes be consulted at this meeting.[7]  Plaintiff does not explain the manner in which this indicates a conspiracy with the Correction Defendants, therefore, we do not consider it evidence of such.[8]

In the course of their dealings, it is inevitable that the MHM Defendants and the Corrections Defendants would have meetings with each other.  Without more evidence of an invidious conspiracy, a rational jury could not conclude based merely on the occurrence of the meetings that the parties conspired to violate the plaintiff's rights.   Accordingly, we conclude that the plaintiff has not submitted sufficient evidence of a conspiracy for us, or a reasonable jury, to conclude that the defendants

---

[7]Plaintiff's affidavit confirms Mont's note of this meeting, and states that she "went and found Deputy Kerestes and I asked him if he would participate in the meeting."  (Doc. 59-6, Pl. Aff. At ¶ ll).

[8] Plaintiff also mentions three other meetings between Mont and a "Major Miner" and "Lieutenant Sheriff."  Plaintiff cites to exhibit DD for these occurrences but no evidence of these meetings is present in exhibit DD.  Thus, we will not consider them.

conspired under section 1985.

## III.  Race Discrimination

Plaintiff's third cause of action asserts that MHM Correctional Services and the Pennsylvania Department of Corrections discriminated against her based upon race.   Both defendants move for summary judgment on this claim, and we will address them separately.

### A.  Defendant Pennsylvania Department of Corrections

Plaintiff asserts that the DOC banned her from the prison facility due to racial discrimination in violation of Title VII of the Civil Rights Act of 1964.  The DOC argues that plaintiff has not presented sufficient evidence to support this claim and judgment in its favor is appropriate.  After a careful review, we agree.

Initially, the DOC correctly argues that plaintiff has no direct evidence of discrimination.   Plaintiff's brief points us to no direct evidence of discrimination in the decision to ban her from the prison.[9]  We thus must apply the <u>McDonnell Douglas</u> burden-shifting analysis.  In order to withstand a summary judgment motion, a plaintiff suing for employment discrimination under Title VII must establish that the plaintiff's protected trait "played a role in the employer's decision making process and had a determinative influence on the outcome of that process."  <u>Monaco v.</u>

---

[9]As direct evidence of racial discrimination, plaintiff asserts that she was the only black member of MHM at Frackville and that 96.9 % of SCI-Frackville's employees were white and 1.5 % were black.  In a vacuum these statistics do not indicate discrimination.  We would need something to compare them to.  For example, plaintiff has not provided us with information regarding the breakdown population in general in the Frackville area.

American Gen. Assurance Co., 359 F.3d 296, 300 (3d Cir. 2004).[10]   A plaintiff may meet this burden with either direct evidence sufficient to satisfy the requirements of Justice O'Connor's concurring opinion in Price Waterhouse v. Hopkins, 490 U.S. 288 (1989) or with indirect evidence sufficient to satisfy the three-step burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green,  411 U.S. 792, 802 (1973).

When attempting to establish discrimination with direct evidence, a plaintiff confronts a "high hurdle." Anderson v. Consolidated Rail Corp., 297 F.3d 242, 248 (3d Cir. 2002).  The proffered evidence must demonstrate that the "decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Id. (quoting Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)).  "In other words, the evidence must reveal a sufficient discriminatory animus making it unnecessary to rely on any presumption from the prima facie case to shift the burden of production." Id.   Plaintiff has not presented direct evidence of discrimination, therefore, we will address her claims under the McDonnell Douglas analysis.[11]

─────────────────

[10]Plaintiff asserts that her section 1983 claims and PHRA claims have not been challenged.   We disagree as the standard of review with regard to a Title VII claim of discrimination is the same for a section 1983 claim, see Stewart v. Rutgers, 120 F.3d 426, 432 (3d Cir. 1997), and a PHRA claim.  Glanzman v. Metropolitan Management Corp., 391 F.3d 506, 509 n.2 (3d Cir. 2004).  Therefore, our conclusion with regard to the Title VII claims shall also apply to the PHRA and section 1983 claims.

[11]In fact, to oppose a claim of disparate treatment, the defendants presented evidence that from January 2004 on, eleven employees have been banned from the prison, inclusive of plaintiff, and that all except plaintiff were Caucasian and five of them were female.   (Doc. 47-2,

Under <u>McDonnell Douglas</u>, the plaintiff must first make a *prima facie* showing of discrimination. <u>Pivirotto v. Innovative Systems, Inc.</u>, 191 F.3d 344, 352 n.4 (3d Cir.1999). A plaintiff can establish a prima facie case by showing that: (1) she is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment despite her qualifications; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position. <u>Sarullo v. United States Postal Service</u>, 352 F.3d 789, 797 (3d Cir.2003) (citations omitted). If the plaintiff cannot establish these elements, the defendant is entitled to judgment as a matter of law. <u>Pivirotto</u>, 191 F.3d at 352 n. 4.

When the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant and requires that it produce some evidence of a legitimate, nondiscriminatory reason for the adverse employment action. <u>Id.</u>

"If the plaintiff succeeds, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge; the defendant need not prove that the articulated reason actually motivated the discharge." <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 n.2 (3d Cir. 1997) (internal quotation marks and citations omitted).

The DOC does not address the plaintiff's *prima facie* case, but simply

_____

Corrections Def. Ex. A, Affidavit of Robert D. Shannon at ¶ ¶ 21-22).

18

skips to their legitimate non-discriminatory reason for the plaintiff being banned from the facility.   Defendants assert that the reason for banning plaintiff was because she created a security threat to the staff by making inflammatory statements to the inmates.   An investigation into this occurrence was made by the prison during which plaintiff herself was interviewed.   During the interview, instead of acknowledging that she used poor judgment, plaintiff defended her actions.   We find that the DOC has met its burden with this evidence.

Because a legitimate non-discriminatory reason has been presented, the burden of proof shifts back to the plaintiff who must present evidence that the legitimate non-discriminatory reason is merely pretext for discrimination.   To meet her standard of proof plaintiff must "submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

Plaintiff has done neither in the instant case.   She apparently asserts that the legitimate non-discriminatory reason is unbelievable because the conclusion that the plaintiff made such statements is based upon unreliable hearsay.   Plaintiff's argument is unconvincing.   It is uncontested that she had to wait for the guard to open the door for her on the day in question.   She then accused the guard of failing to open the

door because she was black.[12]  She admits that she told of this incident to her class, which was comprised of inmates.  It came to the Corrections Defendants attention when an inmate told the guard in question that plaintiff had told her class that he was a racist.   Moreover, the  defendant does not have to prove that it made the right decision or a sound decision, merely that it was a decision not based on illegitimate criteria.   Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir.1997)  Plaintiff points to nothing that would make the decision appear illegitimate.[13]

## B. Defendant MHM

Similarly, Defendant MHM claims that it had a legitimate non-discriminatory reason for terminating plaintiff's employment and that plaintiff has provided no evidence to rebut that reason.  We agree.

MHM discharged plaintiff after it learned that she was banned from SCI-Frackville.  As stated by Rock Welch, MHM's senior vice president of operations: "After learning that Ms. Bates had been banned from the prison, I spoke with Al Williams, MHM's corporate Human Resources Manager, about whether MHM should terminate Ms. Bates employment. Mr. Williams and I decided that because MHM had been put on notice by the DOC of Ms. Bates' potentially dangerous conduct, the company could not take the risk that she would engage in such behavior at another correctional institution.  We determined that rather than transfer Ms. Bates, her conduct was of such a serious nature that it warranted termination."

---

[12]Uncontested evidence establishes that caucasian employees also had to wait for guards to open doors for them.

[13]Regardless, plaintiff was not an employee of the DOC, and the DOC would not be liable with regard to employment discrimination.

20

(Doc. 35-3, Welch Aff. ¶ 14).

Once again, to meet her standard of proof plaintiff must "submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." <u>Fuentes</u>, 32 F.3d at 762. Instead of attacking whether the MHM terminated her employment because of her being barred from SCI-Frackville, she instead attacks the misconduct that she is alleged to have partaken in. (Doc. 56, Pl. Counterstatment of Material Facts, ¶¶ 61-65). Whether or not plaintiff actually engaged in the misconduct for which she was banned from the prison, however, goes to the wisdom of the dismissal, not whether it was based on legitimate grounds or not. Accordingly, we find that judgment should also be granted to Defendant MHM on the racial discrimination in employment count, Count III of plaintiff's complaint.[14]

---

[14]Plaintiff has briefed the motion as if the complaint also contains a gender discrimination claim separate from the hostile work environment claim found in Count IV. A review of the complaint reveals no such claim. In Count III, which is labeled "Discrimination Because of Race" plaintiff does allege that she was terminated because of her gender. (Doc. 1, Complaint, ¶ 92). Plaintiff has not presented sufficient evidence to support such a cause of action. She presents as direct evidence of discrimination that Kerestes and Shannon have a history of discriminatory conduct towards women. Debra Hall, who is not a party to the instant action, successfully sued the DOC and obtained a verdict for one million dollars. That the defendants have a reputation for discriminatory conduct or that the defendant DOC was unsuccessful in defending a previous lawsuit is not direct evidence that the plaintiff was discriminated against in this case.

## IV.  Hostile Work Environment

Count IV of plaintiff's complaint asserts a hostile work environment claim based on gender and race against MHM and the Commonwealth Department of Corrections. (Doc. 1, Compl. ¶¶ 93-96).  Defendants assert that plaintiff has not have any evidence to support this claim.  After a careful review, we agree.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ..race... [or] sex." 42 U.S.C. § 2000e-2(a)(1).  The United States Supreme Court has explained that Title VII supports a cause of action where sexual harassment was so pervasive that it had the effect of creating a hostile work environment and of altering the conditions of employment. Meritor Savings Bank, FSB v. Vinson, 477 U.S., 57, 66 (1986).  The law provides the following five elements for a hostile work environment claim:

(1) the employee suffered intentional discrimination because of her sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability.  Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001).[15]

_____

[15]While the Weston court speaks in terms of sex discrimination the same standard applies to plaintiff's claim of hostile work environment based upon race.  Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005).

Defendant asserts that in the instant case there is no evidence of pervasive and regular discrimination and there is no respondeat superior liability.  After a careful review, we agree.

"Harassment is pervasive when incidents of harassment occur either in concert or with regularity." Andrews, 895 F.2d at 1484 (internal quotation omitted). "A few isolated incidents" do not suffice. See, e.g., King v. City of Phila., 66 Fed. Appx. 300, 305 (3d Cir.2003) (two "isolated and sporadic incidents ... do not demonstrate the pervasive atmosphere of harassment required to prove a Title VII violation." ).   In the instant case, plaintiff has presented three comments that she finds were based on her gender and one evidently aimed at her race.  These are:

1) Defendant Mont stated that people should stay with their own kind, race and religion-wise.  (Doc. 35-5, Pl. Dep. at 47-48).

2) Defendant Mont declared that women do not have the right to say what they want to do with their own bodies; (Id. at 49-50).

3) Defendant on more than one occasion sang to the plaintiff "You Are So Beautiful to Me."  (Id. at 51).

Plaintiff included all of these statements in a complaint that she filed on July 15, 2003 with Wexford management.  (Id. at 52).  First, we find that one statement regarding race is insufficient to establish a cause of action for hostile work environment based upon race and that judgment will be granted to the defendants on the racial harassment claim.[16]  To hold

_____

[16]Plaintiff notes that when new employees began work at the prison, their pictures were displayed in the front lobby so that other employees could become acquainted with them.  Instead of being posted immediately, plaintiff's picture was put on display for "two to three" weeks from when she

23

otherwise, would be to ignore the requirement that the harassment be pervasive and regular for a Title VII claim.  *Cf*. <u>Dickerson v. State of N.J. Dept. of Human Services</u>, 767 F. Supp. 605 (D.N.J. 1991) (racial harassment found where co-workers repeatedly used racial slurs, the plaintiffs' work lockers were defaced with racist graffiti, racist graffiti appeared in the bathroom and was not removed for months, and incidents of racial discord were repeated, continuous and occurred for almost one year).

Likewise, that Mont declared once that women do not have a right to say what they want to do with their own bodies, no matter how reprehensible, is an isolated incident, which does not rise to the level of pervasive and regular to as support a claim for sexual harassment.

The fact that on several occasions Mont sang "You Are So Beautiful" to the plaintiff is also not evidence of pervasive and regular sexual harassment.   In fact, at her deposition indicated that she was more annoyed than intimidated by the singing.  (Doc. 58-24, Pl. Dep. at 32).

All these instances of alleged sexual harassment taken together or singly do not rise to the level of "regular and pervasive" that constitutes actionable sexual harassment.  Plaintiff has simply failed to establish that the harassment was severe enough to meet the legal standard. Accordingly, summary judgment will also be granted to the defendants with

―――――――――――――

began her employment. (Doc. 59-6, Pl. Aff. ¶ f).  Plaintiff asserts that this is discrimination based upon race, but has presented no evidence that the failure to display her picture had anything to do with her race at all.  We thus do not treat the failure to immediately display her picture as evidence of discrimination.

regard to the sexual harassment claim.[17]

## V. Retaliation

The fifth cause of action raised by plaintiff's complaint is for retaliation.  Plaintiff asserts that MHM Correctional Services and the Commonwealth of Pennsylvania Department of Corrections retaliated against her for having reported gender, race and age harassment and illegal treatment of inmates.   (Doc. 1, Compl. ¶¶ 97-99).

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must offer evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir.1995).   If plaintiff is able to meet the *prima facie* case, we apply the burden-shifting analysis described above.

We will again address the defendants separately.

### A. Defendant DOC

Defendant DOC argues that plaintiff has failed to meet her *prima facie* case.  The actions of which plaintiff complains that relate to Defendant DOC is evidently the reporting of alleged illegal treatment of inmates.  The record, however, contains no evidence that she made any such report.  The complaint asserts: "The Plaintiff was also a friend of

---

[17]Moreover, all of these instances of alleged harassment were included in plaintiff's initial complaint with Wexford Human Services prior to Defendant MHM becoming plaintiff's employer.  Plaintiff has not established why she can hold MHM liable for harassment that occurred during her employment with Wexford.

individuals in the Prison Society [to] whom she related the illegal activities within the facility which would then be investigated by the Society to the extreme annoyance of the individual Defendants[.]" (Doc. 1, Compl. ¶ 75). When asked at her deposition about the particulars of these "illegal activities" plaintiff could not recall any.  (Doc. 58-24, Pl. Dep. at 27-28). She could not remember any specific instances of illegal activities that she reported to the Prison Society.  (Id. at 37).  She also stated that she did not know if anyone at the prison knew that she was making these reports to the Prison Society.  (Id. at 39).  Defendant Shannon indicates that "The Prison Society has never contacted me about any matter which originated from information provided by Wanda Bates which resulted in SCI-Frackville taking any corrective action."  (Doc. 47-2, ¶ 25).

Thus, plaintiff has failed to establish any kind of causal connection between any reports she made to the Prison Society and an adverse action by the DOC.  She has not presented evidence of any wrongdoing that she reported to the organization or any proof that the prison official knew about the reporting.  Accordingly, judgment will be granted to the DOC on the retaliation claim.

### B. Defendant MHM

On July 15, 2003, plaintiff filed a formal complaint with Wexford Correctional Services for harassment and discrimination.  In December of 2003, plaintiff filed the first of three complaints that she would file with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission.  First, it should be noted that the first of these complaints were filed while plaintiff when Wexford employed the plaintiff, and will not be used to judge Defendant MHM's treatment of her.

26

Plaintiff has not presented proof of retaliation.  She has presented evidence perhaps that she felt "harassed" and discriminated against and filed complaints.  Subsequent to the complaints the harassing and discriminating treatment, of the same nature as the treatment she complained of, continued.  There is no evidence that she was then being treated differently or worse in retaliation for her complaints.  In other words, plaintiff complains that she was consistently treated poorly, even before she filed complaints, and no evidence that the treatment became worse or changed after she complained.  For example, before she made her complaints, the following is "harassing" treatment she complains about: her supervisor made it her responsibility to remind another employee of his Coping Skills group  (Doc. 59-6, Pl. Aff. ¶ l); her supervisor wanted her to stand outside to watch inmates at recreation instead of inside the door (Id. at ¶ m); she constantly received memos from her supervisor; (Id.  at  ¶ o); she felt that she was being singled out and that her supervisor nitpicked her work; (Id. at ¶ s); her supervisor directed her to document information in a certain format that others were not required to use.  (Id. at  ¶ w).  After the filing of the complaint, she: received another memo regarding documenting the information in a particular format (Id. at ¶ hh); Elaine Gedman, Director of Wexford's Human Resources disciplined her and told her that she must do whatever her supervisor tells her to do (Id. at ¶ ii); she was asked to only ask for medical charts in the mornings (Id. at ¶ kk); she was disciplined for standing in side the door and reading a book while the patients were in the yard (Id. at ¶ rr).  Thus, she has not presented a causal link between the treatment and her making complaints.

**VI.  Age Discrimination in Employment**

27

Plaintiff's sixth cause of action asserts age discrimination in employment.  As set forth above, plaintiff no longer is no longer proceeding under this

## VII.  Conspiracy

The seventh count of plaintiff's complaint sets forth a cause of action for common law conspiracy against Defendants Mont, Shannon and Kerestes.  (Doc. 1, Compl. ¶¶ 105-106).  As set forth above in section II, plaintiff has not presented any evidence of conspiracy.  Judgment will thus be granted to the defendants on this count.

## VIII.  Wrongful discharge

Wrongful discharge is alleged against all the defendants in Count VIII of the plaintiff's complaint.   (Doc. 1, Compl. ¶¶ 107-108).  The plaintiff's wrongful discharge claim is based upon state law.  If the federal claims in a case are dismissed prior to trial, the state claims should be dismissed as well.  United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). Accordingly, the wrongful discharge claim will be dismissed.

## IX. Pennsylvania Human Relations Act

The final count of plaintiff's complaint asserts a violation of the Pennsylvania Human Relations Act against all the defendants.  (Doc. 1, Compl. ¶¶ 109-111).  Pennsylvania courts interpret the PHRA in the same manner as its federal counterparts such as Title VII.   See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.1996) ( "Pennsylvania courts ... generally interpret the  in accord with its federal counterparts ...." ).   Accordingly, for the same reasons set forth above with regard to the plaintiff's federal causes of action, judgment will be granted to the defendants on plaintiff's PHRA claim.

28

**Conclusions**

For the foregoing reasons, the defendants' motions for summary judgment will be granted.  An appropriate order follows.[18]

---

[18]Defendants also move to strike several of the plaintiff's exhibits.  As we have ruled in the defendants' favor on the summary judgment motions, we will deny these motions as moot.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WANDA L. BATES, | : | No. 3:05cv2285 |
| Plaintiff | : | |
| v. | : | (Judge Munley) |
| | : | |
| MHM CORRECTIONAL SERVICES; | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| CORRECTIONS SCI-FRACKVILLE; | : | |
| DAVID MONT; ROBERT D. | : | |
| SHANNON and JOHN | : | |
| W. KERESTES, | : | |
| Defendants | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>ORDER</u>

_____**AND NOW**, to wit, this 11th day of February 2008, the defendants'
motion for summary judgment (Doc. 33, Doc. 34) are **GRANTED**.
Defendant's motions to strike exhibit (Doc. 60-63) are **DENIED** as moot.
The Clerk of Court is directed to close this case.

                              **BY THE COURT:**

                              **s/ James M. Munley**
                              **JUDGE JAMES M. MUNLEY**
                              **United States District Court**

30